**FEDERAL MARITIME COMMISSION, Petitioner-Appellant,**

v.

**PORT OF SEATTLE, Respondent-Appellee.**

**No. 74–1393.**

United States Court of Appeals, Ninth Circuit.

July 31, 1975.

Eloise E. Davies, Atty. (argued), Dept. of Justice, Washington, D. C., for petitioner-appellant.

Peter D. Byrnes (argued), Seattle, Wash., for respondent-appellee.

## OPINION

Before BROWNING and DUNIWAY, Circuit Judges, and ORRICK,* District Judge.

ORRICK, District Judge:

This case presents a question we had thought settled by the Supreme Court thirty-five years ago, namely, whether a district court has jurisdiction to deny the enforcement of a subpoena issued by an administrative agency on the ground that the agency lacked jurisdiction over the subject matter of the inquiry. Since the Supreme Court has held that a district court's function in enforcing an administrative subpoena extends no further than to ascertain whether the information sought is "not plainly incompetent or irrelevant to any lawful purpose" of the administrative authority (*Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943)), we reverse the ruling of the district court.

The Federal Maritime Commission (the "Commission") appeals from an order of the United States District Court for the Western District of Washington denying the Commission's application for the enforcement of certain discovery orders of its Administrative Law Judge against the Port of Seattle (the "Port") on the

---

* Honorable William H. Orrick, Jr., United States District Judge, Northern District of California, sitting by designation.

grounds, first, that the district court was under a duty to enforce the Commission's discovery orders without requiring a showing of statutory coverage of the subject matter of the investigation, and, second, that in any event the Commission had not exceeded its investigatory authority since the Port's consolidation service is within the coverage of the Shipping Act of 1916 (46 U.S.C. § 801 et seq.) (the "Act"). Since we reverse on the first ground, we need not reach the second.

## I.

The Commission is an independent regulatory agency of the United States charged with the administration and enforcement of the Act. The Act vests the Commission with broad regulatory powers. Section 17 (46 U.S.C. § 816) provides that every carrier and every other person subject to the Act shall establish, observe and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing or delivering of property and gives the Commission power whenever it makes a finding that any such regulation or practice is unjust or unreasonable to determine, prescribe and order enforced

a just and reasonable regulation or practice.[1]

Congress further conferred upon the Commission broad investigatory powers. Section 22 of the Act (46 U.S.C. § 821) gives the Commission the power to investigate complaints made to it and the power to investigate complaints upon its own motion. Under Section 27 (46 U.S.C. § 826) of the Act, the Commission may compel the attendance of witnesses and the production of books, papers, documents and other evidence by subpoena in such manner and to such an extent as the Commission may by rule or regulation require. Under Section 29 of the Act (46 U.S.C. § 828), if any order of the Commission is violated, the commission may apply to a district court having jurisdiction over the parties to have its orders enforced by injunction or other proper process.

The Port, a public port district organized under the laws of the State of Washington, owns and operates extensive wharfage, dock, warehouse and other terminal facilities used in connection with ocean-going common carriers arriving at Seattle. The Port is subject to the jurisdiction of the Commission by the definitions as set forth in Section 1 of the Act (46 U.S.C. § 801).[2] The Port

1. Section 17 of the Act (46 U.S.C. § 816) provides:

"No common carrier by water in foreign commerce shall demand, charge, or collect any rate, fare, or charge which is unjustly discriminatory between shippers or ports, or unjustly prejudicial to exporters of the United States as compared with their foreign competitors. Whenever the Federal Maritime Commission finds that any such rate, fare, or charge is demanded, charged, or collected it may alter the same to the extent necessary to correct such unjust discrimination or prejudice and make an order that the carrier shall discontinue demanding, charging, or collecting any such unjustly discriminatory or prejudicial rate, fare, or charge. Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the Commission finds that any such regulation or

practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice."

2. Section 1 of the Act (46 U.S.C. § 801) provides in pertinent part:

"The term 'common carrier by water' means a common carrier by water in foreign commerce or a common carrier by water in interstate commerce on the high seas or the Great Lakes on regular routes from port to port.

The term 'other person subject to this chapter' means any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water.

The term 'person' includes corporations, partnerships, and associations, existing under or authorized by the laws of the United States, or any State, Territory, District, or possession thereof, or of any foreign country."

owns a substantial number of marine terminals, warehouses and container freight stations. All of these facilities are operated under published tariffs approved by the Commission.

The Port is also a service organization providing a number of services for the community, including consolidation services for OCP (Overland Common Points) cargo arriving by ocean carrier and moving inland from Seattle. Utilizing sophisticated computer equipment, the Port matches shipments stored in its warehouses and at other terminal facilities for consolidation with other inbound shipments arriving by ocean carrier and having a common inland destination. The Port arranges for inland carriers to combine their "short" shipments into full container or full carload lots and thus obtain the most favorable inland freight rates. As part of this consolidation service the Port performs most of the paperwork connected with the storage and the movement and transfer of the OCP cargo to the inland carrier.

On December 16, 1970, the Commission entered an order that, pursuant to Sections 17 and 22 of the Act, an investigation be instituted to determine whether the Port's consolidation service and any other services performed in connection therewith may be prohibited by Section 17 as being unjust or unreasonable. The Commission directed the Administrative Law Judge and the parties to address themselves to the following issues *inter alia* :

"1. Whether the Port's practices in providing consolidation services and any other services in connection therewith free of charge and only for inbound OCP shipments is permissible under Section 17, Shipping Act, 1916.

\* \* \* \* \* \*

3. Whether the failure of the Port to indicate the availability of its con-

solidation service in its terminal tariff is contrary to the Commission's General Order 15, 46 C.F.R. § 533, and Section 17, Shipping Act, 1916."

With respect to those issues, counsel for the Commission submitted interrogatories and requested the production of documents. The Port raised objections to the jurisdiction of the Commission to investigate the Port's consolidation services claiming that such services did not constitute and were not related to its marine terminal or warehousing activities. The Administrative Law Judge overruled these jurisdictional objections and directed the Port to provide the answers. The Port refused to do so, and the Commission accordingly made application to the district court pursuant to Sections 27 and 29 for an order enforcing the discovery orders of the Administrative Law Judge compelling answers to interrogatories and ordering the production of documents.

The district court limited the discovery to only those facts necessary to determine the Commission's jurisdiction to investigate the Port's consolidation services, and refused to let the Commission inquire into the "details" of the consolidation practices.[3] In effect, the court held that the district court should first determine the Commission's jurisdiction before enforcing the discovery order.

## II.

It is beyond cavil that the very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the rapid exercise of the power to investigate the activities of the entities over which it has jurisdiction and the right under the appropriate conditions to have district courts enforce its subpoenas. This is not to say that a district court must grant all applications from administrative agencies to enforce their

---

**3.** The case was reassigned and the discovery issues were, therefore, considered by a second district court judge. He, too, refused to permit substantive discovery concerning the Port's consolidation services, adjudging that consolidation practices were beyond the scope of the Commission's jurisdiction.

subpoenas—not at all. But, the Congress and the Supreme Court have effectively narrowed the scope of the district courts' powers to ascertaining "whether the information sought is relevant to any lawful purpose of the administrative authority". 1 K. Davis, *Administrative Law Treatise*, § 3.12, at 220(1958 ed.). Or, as Justice Jackson put in in *Endicott Johnson Corp. v. Perkins, supra,* 317 U.S., at 509, 63 S.Ct. 339, whether the evidence sought by the subpoena was not "plainly incompetent or irrelevant" to "any lawful purpose" of the agency. If it is not, the district court is obligated to compel production of the documents. In the case at bar, Congress specifically limited the power of the district court in Section 29 of the Act to determining "that the order was regularly made and duly issued". If it was so made, Congress commanded the district court to enforce the subpoena by providing, as it did, in Section 29 "it *shall* enforce obedience thereto by a writ of injunction or other proper process, mandatory or otherwise" (emphasis added).

Thus, it was early determined that each independent regulatory administrative agency has the power to obtain the facts requisite to determining whether it has jurisdiction over the matter sought to be investigated. After the agency has determined its jurisdiction, that determination may be reviewed by the appropriate court.

The practical reasons for this rule are self-evident. From the spawning of the so-called "alphabet soup" independent administrative regulatory agencies in the early New Deal days, efforts have never ceased to try to limit the scope of the agencies' powers. No better method can be devised than that of limiting the investigative power and thus crippling the effectiveness of the agency. The case at bar is a good example. Plainly, to make a responsible determination of its jurisdiction, the Commission must have access to information in the care, custody and control of the Port. There is no way the Commission can make a credible showing of its statutory coverage without such information. The matter is at an impasse.

The situation is not new. In at least five Supreme Court decisions, and in decisions by most of the courts of appeals, this question has been decided adversely to appellees and the decision of the court below. The seminal case is Justice Jackson's opinion in *Endicott Johnson Corp. v. Perkins, supra.* That case involved a dispute over the Secretary of Labor's authority to obtain corporate records for an investigation under the Public Contracts Act which the Secretary administered. The corporation resisted surrendering its records, asserting the Secretary's inquiry was beyond her statutory responsibilities. The district court concurred and refused to enforce an administrative subpoena. In reversing, Justice Jackson held "Congress submitted the administration of the Act to the judgment of the Secretary of Labor, not to the judgment of the courts" (317 U.S. at 507, 63 S.Ct. at 342). He then went on to say as clearly as it could be said:

"Nor was the District Court authorized to decide the question of coverage itself. The evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose of the Secretary in the discharge of her duties under the Act, and it was the duty of the District Court to order its production for the Secretary's consideration." Id. at 509, 63 S.Ct. at 343.

Three years later, Justice Rutledge, in *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), again made it clear that the question of statutory coverage must be determined by the administrative agency. In that case the Administrator of Wages and Hours sought to subpoena the records of a newspaper publishing corporation in a proceeding under the Fair Labor Standards Act. There, as here, the corporation claimed to be exempt from the Act's provisions. Justice Rutledge held, among other things, that were such a position to be taken it:

"* * * would stop much if not all of investigation in the public interest at the threshold of inquiry * * *. This would render substantially impossible [the administrator's] effective discharge of the duties of investigation and enforcement which Congress has placed upon him. And if his functions could be thus blocked, so might many others of equal importance." Id. at 213, 66 S.Ct. at 508.

As long as twenty-five years ago the Supreme Court in *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), likened an agency's investigative powers to those conferred upon a grand jury which may investigate on suspicion alone without a showing of probable cause. Mr. Justice Jackson, speaking for the Court, said:

"Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law." Id. at 642–643, 70 S.Ct. at 364.

"Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest." Id. at 652, 70 S.Ct. at 369.

With one exception, *Crafts v. Federal Trade Commission*, 244 F.2d 882 (9th Cir. 1957), which was reversed by the Supreme Court (355 U.S. 9, 78 S.Ct. 33, 2 L.Ed.2d 23 (1957)), we have consistently followed the principles enunciated in the Supreme Court cases. *Mines and Metals Corp. v. Securities and Exchange Commission*, 200 F.2d 317 (9th Cir. 1952), cert. den. 345 U.S. 941, 73 S.Ct. 832, 97 L.Ed. 1367 (1953); *United States v. Litton Industries, Inc.*, 462 F.2d 14 (9th Cir. 1972). We also applied the doctrine to the Commission's enforcement of its orders under Section 21 of the Act in *Pacific Westbound Conference v. United States*, 332 F.2d 49, 53 (9th Cir. 1964). In that case, a conference of twenty-five shippers was required to comply with the Commission's order to produce documents concerning shipping charges since the information was relevant to ascertaining "the measure of compliance with the named regulatory statutes and the need of future Commission action" (332 F.2d at 52–53).

The doctrine has also been consistently followed in other circuits. See, e. g., *Federal Trade Commission v. Browning*, 140 U.S.App.D.C. 292, 435 F.2d 96 (1970) (Federal Trade Commission subpoena duces tecum enforced against private company being investigated for antitrust violations); *United States v. Feaster*, 376 F.2d 147 (5th Cir. 1967), cert. den., 389 U.S. 920, 88 S.Ct. 237, 19 L.Ed.2d 265 (1967) (National Mediation Board subpoena enforced against Alabama State Docks Department).

Recently, the Second Circuit in *Securities and Exchange Commission v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047 (2d Cir. 1973) decided a case remarkably similar to the case at bar. There the court granted the enforcement of a Securities and Exchange Commission subpoena of whiskey warehouse receipts for the purpose of determining the jurisdictional justification for the agency investigation. The court held:

"[The subjects of the investigation] raise serious questions about whether their activities are subject to regulation by the SEC \* \* \*. [I]t has long been settled that such issues are not to be decided in subpoena enforcement actions. The Commission must be free without undue interference or delay to conduct an investigation which will adequately develop a factual basis for a determination as to whether particular activities come within the Commission's regulatory authority." Id. at 1052–1053.

The specific application of the doctrine to the Commission has been before federal courts over and over again. The Commission's orders have been routinely enforced by the district courts under the authority of Section 29 of the Act without resort to preliminary jurisdictional hearings. See, e. g., *Lee v. Federal Maritime Board,* 284 F.2d 577 (9th Cir. 1960) subpoena enforced in investigation of Alaskan shipping rates); *Federal Maritime Commission v. Transoceanic Terminal Corp.,* 252 F.Supp. 743 (N.D.Ill.1966) (subpoena enforced in investigation of misdeclarations in shipping carrier's billings).

### III.

A word should be said concerning the so-called stipulation between counsel to the effect that the parties were submitting "the issue of the jurisdiction to conduct this investigation" to the court for determination. The Commission could, of course, waive its right to assert its primary jurisdiction over the subject matter of the investigation into the Port's activities by so stipulating with counsel for the Port.[4] But that is not what happened in the case. The "stipulation" here was entered into only after the court had rejected the Commission's primary jurisdictional showing by the Commission. Confronted with this ruling, in order to obtain any discovery at all, the Commission had no choice but to submit the issue of its jurisdiction to investigate the Port to a judicial determination. This so-called stipulation was, therefore, no more than a ratification by the parties of the court's prior ruling that no discovery could occur unless it were directed to the jurisdictional issue and that the court, not the Commission, would make this determination. Viewed in this posture, the stipulation does not preclude the Commission's right to argue on appeal the same contentions of primary jurisdiction that it raised before the district court and that were erroneously rejected by that court.

### IV.

We hold, accordingly, that the court below erred when it required a conclusive showing of the Commission's jurisdiction over the investigation before it would enforce the discovery orders. We remand the case to the lower court to determine whether the discovery orders

---

4. The doctrine of primary jurisdiction is a judge-made principle which governs only the question of which tribunal shall act initially. It does not divide powers between the courts and the agencies. 3 K. Davis, *Administrative Law Treatise,* § 19.09, at 53 (1958 ed.). In considering the question of the Federal Maritime Board's primary jurisdiction in *Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1951), the Supreme Court said:

"The Court thus applied a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined."

It is significant that the Court did not say that judicial power is withdrawn, but only that the agency should not be by-passed.

The purpose of the doctrine of primary jurisdiction is to permit an agency to exercise its expertise and assist the court in an area of agency specialization. If then an agency chose to stipulate away its right to make an initial determination, the court could consider the issue without the benefit of agency assistance.

of the Administrative Law Judge of the Commission were "regularly made and duly issued" and, if they were, the district court "shall enforce obedience thereto by a writ of injunction or other proper process mandatory or otherwise" pursuant to Section 29 of the Act.

Reversed and remanded.